# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**DEBRA HAMILTON,**

      **Plaintiff,**

v.
                                    **Civil Action No. 2:05CV03**
                                      **(Judge Robert E. Maxwell)**

**JO ANNE B. BARNHART,**
**Commissioner of Social Security,**

      **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the defendant Commissioner of the Social Security Administration ("Defendant" and sometimes "Commissioner") denying the Plaintiff's claim for supplemental security income benefits ("SSI") under Title XVI of the Social Security Act. The matter is awaiting decision on Plaintiff's letter motion for summary judgment [Docket Entry 8] and Defendant's motion for summary judgment [Docket Entry 9] and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

## I. PROCEDURAL HISTORY

Debra Hamilton ("Plaintiff") filed her current application for Supplemental Security Income benefits on September 22, 2000, alleging disability since September 15, 1999, due to back pain, leg pain, shoulder pain, headaches, fibromyalgia, and depression (R. 278-79, 297). The West Virginia state agency denied her claim initially and on reconsideration (R. 232-33, 242-44). At Plaintiff's request, an administrative hearing was conducted by Donald McDougall, Administrative Law Judge ("ALJ"), on February 6, 2002, at which Plaintiff and John Panza, a Vocational Expert ("VE"),

testified (R. 522-43). On June 19, 2002, the ALJ issued a decision which was unfavorable to Plaintiff and of which she requested Appeals Council review (R. 260). On March 5, 2003, the Appeals Council granted Plaintiff's request for review and entered an order vacating the ALJ's hearing decision and remanding Plaintiff's case to the ALJ (R. 260-62). On October 29, 2003, ALJ McDougall conducted an administrative hearing at which Plaintiff, Dr. Leon Reid, a medical expert, and VE Eugene Czuczman testified (R. 544-71). On November 12, 2003, the ALJ issued a decision finding that Plaintiff could perform a limited range of light work and, therefore, was not disabled within the meaning of the Act (R. 24-34). Subsequent to the decision by the ALJ, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 16-18).

On January 21, 2005, *pro se* Plaintiff filed the instant case, *via* a letter complaint, in the United States District Court for the Northern District of West Virginia [Docket Entry 1]. On March 29, 2005, Defendant answered Plaintiff's letter complaint [Docket Entry 5]. On April 4, 2005, the District Judge ordered Plaintiff to file her brief in support of her claim for relief on or before April 28, 2005 [Docket Entry 6]. On July 12, 2005, the District Judge issued an order to show cause directing Plaintiff to file her motion for summary judgment and brief in support thereof on or before August 1, 2005 [Docket Entry 7]. On July 26, 2005, Plaintiff filed a letter response to the Court's order to show cause, stating therein the reasons she felt she could not perform work activities [Docket Entry 8]. On August 19, 2005, Defendant filed her motion for summary judgment and brief in support thereof [Docket Entry 9]. On September 14, 2005, the District Judge ordered Plaintiff's letter in response to the Court's order to show cause be construed as her motion for summary judgment and referred the motions for summary judgment to the undersigned magistrate judge for

2

preparation and submission of findings of fact and recommended disposition [Docket Entry 10]. On September 19, 2005, the undersigned issued an order advising Plaintiff of her right to file with the court, on or before October 19, 2005, any response she may have had to Defendant's motion for summary judgment [Docket Entry 11]. No response to Defendant's motion for summary judgment was filed by Plaintiff.

## II. FACTS

Plaintiff was forty-nine years old at the time of the ALJ's decision. She attended school into her tenth-grade year, but did not finish tenth grade (R. 526). Plaintiff's past work experience included work as a certified nursing assistant, waitress, cosmetic salesperson, and dispatcher (R. 306-313).

On November 19, 1993, Plaintiff reported to the Emergency Department of Davis Memorial Hospital for back pain. Dr. Leo Fedder requested "AP and lateral views of [Plaintiff's] lumbar spine," which revealed scoliosis and an "old appearing compression deformity of L1" (R. 386).

On December 16, 1993, James D. Weinstein, M.D., corresponded with Dr. Fedder. He wrote he had reviewed Plaintiff's "films" and opined they showed a "scoliotic and compressive deformity at T12-L1-L2 area," the exact "origin of her pain." Dr. Weinstein informed Dr. Fedder that Plaintiff had "reinjured the damaged area." He noted Plaintiff had no sciatica. Dr. Weinstein suggested Plaintiff participate in a "program of exercises and strengthening activities to try to strengthen the area" and wear a thoracolumbar back brace "to give her some support." Dr. Weinstein opined Plaintiff did not have an intraspinal pathology but did have a "mechanical" problem (R. 135).

On January 31, 1994, Plaintiff returned to Dr. Weinstein. He noted in a letter to Dr. Fedder

3

that Plaintiff was "feeling a little better on the exercises and walking program" he had prescribed. Dr. Weinstein opined Plaintiff's exercising and walking program were the "long term answer" to her condition, and he encouraged Plaintiff to continue with those permanently (R. 134).

On March 14, 1994, Dr. Weinstein informed Dr. Fedder that Plaintiff had been authorized for a thoracolumbar brace (R. 133).

In a March 30, 1994, letter to Dr. Fedder, Dr. Weinstein wrote Plaintiff continued to experience discomfort. Dr. Weinstein provided Flexeril to Plaintiff (R. 128).

On June 2, 1994, Dr. Weinstein wrote to Dr. Fedder that Plaintiff had gotten a back brace and it seemed to help her condition. Dr. Weinstein again noted Plaintiff needed to exercise and continue to strengthen her back if she were to "get along without using the brace." Dr. Weinstein opined Plaintiff could return to work "if she [was] feeling up to it." He noted Plaintiff asserted she was not capable of returning to work (R. 132).

On August 11, 1994, Dr. Weinstein informed Dr. Fedder Plaintiff continued "to suffer symptoms related to her thoracic syndrome." He opined there was no surgery he would recommend. Dr. Weinstein noted the brace helped Plaintiff, but the exercise program did not. Dr. Weinstein opined Plaintiff had reached the maximum degree of improvement, her whole person impairment was eight percent, and she should be authorized for permanent partial disability by Workers' Compensation (R. 131).

On November 3, 1994, Dr. Weinstein corresponded with Dr. Fedder that Plaintiff continued to experience symptoms of her thoracic syndrome (R. 130).

On January 16, 1995, Dr. Weinstein informed Dr. Fedder, by way of letter, that he would continue Plaintiff's prescriptions as she was "waiting for her disability award" (R. 129).

On June 12, 1995, Dr. Weinstein refilled Plaintiff's prescriptions (R. 127).

On August 24, 1995, Dr. Weinstein noted Plaintiff continued "to suffer with her thoracic syndrome and cannot return to work" (R. 126).

On October 5, 1995, Dr. Weinstein corresponded with Richard Cardot. He reiterated Plaintiff had reached a maximal medical improvement as of August 11, 1994, and that she had a "permanent problem and [was] not getting better" (R. 125).

On November 6, 1995, Dr. Weinstein opined Plaintiff experienced chronic pain from her mid back throughout her whole spinal axis. He requested approval of a thoracolumbar MRI (R. 124).

On January 22, 1996, Dr. Weinstein noted his request for Plaintiff to undergo a thoracolumbar MRI had been denied. Dr. Weinstein wrote that his examination of Plaintiff revealed "palpable thoracolumbar muscle spasm," negative straight leg raising, and negative findings regarding nerve root compression (R. 123).

On April 4, 1996, Dr. Weinstein wrote Plaintiff's symptoms were persisting and that she could not return to work (R. 122).

On June 3, 1996, Dr. Weinstein opined Plaintiff's whole person impairment was eight percent. He noted "a simple strain and sprain phenomenon would provide [a] . . . 5% impairment, but . . . [Plaintiff] has scoliosis and compression deformities," which caused "the impairment to be increased" (R. 121).

On June 17, 1996, Dr. Weinstein wrote Plaintiff had reached the maximum degree of improvement and had a permanent partial disability of eight percent (R. 120).

On August 29, 1996, Dr. Weinstein wrote Plaintiff had been awarded a permanent partial

disability and that he would be available to medicate and evaluate Plaintiff, but not on a "formal time limit" (R. 119).

On March 24, 1997, Dr. Weinstein wrote that Plaintiff reported she experienced sharp pains in her back and legs, which "give out." Plaintiff informed Dr. Weinstein her "left [was] worse than the right." Dr. Weinstein's examination revealed no obvious nerve compression effects. He requested authorization for an EMG and nerve conduction studies of Plaintiff's lower extremities (R. 118).

On May 12, 1997, Dr. Weinstein noted Workers' Compensation refused his request for Plaintiff to undergo EMG and nerve conduction studies. He opined Plaintiff continued "to hurt and her problem [was] persisting" (R. 117).

On December 4, 1997, Dr. Weinstein wrote Plaintiff's condition remained the same in that she continued "to have back problems." Dr. Weinstein noted he could offer no opinion as to Plaintiff's status, a course of treatment for Plaintiff, Plaintiff's prognosis, and a "way [to] ameliorate her condition" as authorization for various testing had been refused (R. 116).

On May 19, 1998, Charles Paroda, D.O, M.D., completed a consultative examination of Plaintiff for the West Virginia Disability Determination Service. Dr. Paroda noted Plaintiff was taking Darvocet N-100 (R. 137). His examination of Plaintiff revealed the following: 1) Plaintiff ambulated with a normal gait and used no ambulatory aid; 2) she was comfortable in the standing, sitting, and supine positions; 3) Plaintiff's mental state and intellectual functioning were normal; 4) Plaintiff's neck was supple; 5) Plaintiff's upper and lower extremity pulses were equal bilaterally; 6) she presented with no clubbing, cyanosis, or edema; 7) palpation of Plaintiff's shoulders, elbows, wrists, hands, hips, knees, ankles, and feet revealed no swelling, tenderness, redness or warmth; 8)

Plaintiff's spinal curvature was normal; 9) palpation and percussion of Plaintiff's spinous processes revealed no tenderness; 10) palpation of Plaintiff's paravertebral muscles revealed no tenderness, swelling, or redness; 11) Plaintiff could perform straight leg lifts to ninety degrees in both the supine and sitting positions; 12) she had normal range of motion in her spine; 13) Plaintiff had tenderness in her lower back, but no spasms, redness, or swelling; 14) her straight leg lifting was negative; 15) Plaintiff complained of pain with flexion at 30 degrees; 16) Plaintiff's extension was twenty-five degrees and side bending bilaterally was thirty degrees; 17) Plaintiff's extremities showed normal range of motion without any restrictions; 18) Plaintiff was neurologically grossly intact; 19) Plaintiff's motor strength was equal bilaterally in both upper and lower extremities; 20) Plaintiff's grip strengths were "32 KGF" on the right and "30 KGF" on the left; 21) she had no muscle atrophy or wasting; 22) her deep tendon reflexes were equal bilaterally in both upper and lower extremities; 23) Plaintiff was able to ambulate on her heels and toes, walk heel-to-toe in tandem, stand on one leg, and squat without difficulty; and 24) Plaintiff was able to write and pick up coins (R. 138-40). Dr. Paroda's impression was for chronic and acute low back pain caused by muscle sprain and strain syndrome and old compression fractures and muscle tension headaches. Dr. Paroda opined "constriction of interest and restriction of activities due to psychiatric problems" appeared unlikely and there was no evidence of deterioration of personal habits (R. 140).

On June 2, 1998, a state agency physician completed a Residual Physical Functional Capacity Assessment of Plaintiff. He found Plaintiff could occasionally lift and/or carry up to twenty pounds; frequently lift and/or carry up to ten pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and push/pull unlimited (R. 144). The state agency physician found Plaintiff was limited to "frequent" climbing,

balancing, stooping, kneeling, crouching, and crawling (R. 145). The state agency physician found Plaintiff had no manipulative, visual, or communicative limitations (R. 146-47). He found Plaintiff was unlimited in her exposure to extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards, but she should avoid concentrated exposure to extreme cold (R. 147). The state agency physician opined Plaintiff's "symptoms are credible" and she was "able to perform light range [of] work" (R. 148).

Plaintiff returned to Dr. Weinstein on June 22, 1998, and reported to him her legs would "give out." She complained of "severe pains." He wrote he was unable to "really evaluate" Plaintiff without her undergoing an EMG, nerve conduction studies, and a MRI (R. 115).

On July 19, 1998, Plaintiff presented to the Emergency Department of Davis Memorial Hospital with back pain. Scott Frame, M.D., evaluated Plaintiff and noted Plaintiff walked "without major difficulty," had flexion and extension that were intact; and had straight leg raising and neurovascular tests that were intact. Dr. Frame opined Plaintiff had low back pain, and she was discharged to "home on Lortab 10" and instructed to visit Dr. Weinstein the following day (R. 168).

On July 27, 1998, Dr. Weinstein wrote Plaintiff had reported to the "emergency room the other day" due to "acute onset of symptoms." He again requested approval of an EMG, nerve conduction studies, and MRI testing for Plaintiff (R. 114).

On August 17, 1998, Hugh M. Brown, M.D., a state agency physician, completed a Residual Physical Functional Capacity Assessment of Plaintiff. He found Plaintiff could occasionally lift and/or carry up to twenty pounds; frequently lift and/or carry up to ten pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight hour workday; and push/pull unlimited (R. 152). Dr. Brown found Plaintiff limited to "frequent"

8

climbing, balancing, stooping, kneeling, crouching, and crawling (R. 153). Dr. Brown found Plaintiff had no manipulative, visual, communicative, or environmental limitations (R. 154-55). Dr. Brown opined Plaintiff's RFC was "reduced to light" (R. 156).

On October 4, 1998, Plaintiff underwent a MRI of her thoracic and lumbar spine at United Hospital Center. The impression for the thoracic spine MRI was for "mild loss of height of T5 and T12 which appear to represent old compressions. No encroachment on the canal or cord" was observed (R. 384). The lumbar spine MRI impression was for "moderate compression deformity of L1 which appears to be an old injury" and "mild, degenerative disc changes of the L spine but no significant encroachment on the thecal sac or exiting nerve root seen" (R. 385).

On October 22, 1998, Dr. Weinstein wrote he had reviewed Plaintiff's lumbar and thoracic MRI's and they showed "the old compression deformity from her previous back fracture, degenerative changes, but no encroachment on any of the neural elements that would require surgery." Dr. Weinstein noted he had "told [Plaintiff] all along" that "the best thing she can do . . . . [was] keep the back as strong as possible with an isometric exercise and walking program" (R. 160).

On January 23, 1999, Plaintiff presented to the Emergency Department of Davis Memorial Hospital with complaints of low back pain (R. 163). Jeffery Harris, D.O., treated Plaintiff. He observed her straight leg raise test to be ninety degrees bilaterally sitting without producing too much discomfort. Plaintiff could stand on her heels and toes bilaterally. He observed some "soft tissue of her back on the left" and "a little scoliosis." Dr. Harris noted Plaintiff was "tender to palpate the mid thoracic and the lumbar area." He diagnosed back pain and gastritis (R. 164). Dr. Harris provided Demoral 50mg and Phenergan 50IM to Plaintiff. She was discharged with instructions

to seek the care of Dr. Weinstein (R. 165)

On January 29, 1999, Plaintiff presented to the Emergency Department of Davis Memorial Hospital with "painful left back and left leg." Plaintiff was injected with Demerol and Phenergan. Dr. Fedder's impression was to "consider left sciatica," and he opined she was "neurovascularly intact." Dr. Fedder prescribed Vicodin, ten with no refills. He noted Plaintiff's condition as "satisfactory" at discharge (R. 159).

On February 16, 1999, Plaintiff underwent a Functional Capacity Evaluation at Elkins Physical Therapy. The evaluation was administered by John DiBacco, P.T., and his report was filed on March 1, 1999 (R. 176-206). Plaintiff's lawyer, Brian Skinner, referred Plaintiff for the evaluation (R. 176). Physical Therapist DiBacco opined Plaintiff's Functional Capacity Evaluation Results showed she could work at the sedentary level for an eight-hour workday. He noted Plaintiff's leg lift and torso lift capacities were eight pounds. Based on spinal inclinometry test results, which were performed in accordance to the *Guides to the Evaluation of Permanent Impairment*, AMA, 4th Ed., 1993, Physical Therapist DiBacco opined Plaintiff had an eighteen percent whole body impairment for her lumbar spine, although he noted, "it must be questioned as to whether the . . . impairment rating [was] valid due to apparent submaximal effort" on the part of Plaintiff. Additionally, Physical Therapist DiBacco opined, based on the administered Blankenship System Behavioral Profile, Plaintiff "exhibited symptom/disability exaggeration behavior." He noted her test scores revealed Plaintiff made "very poor effort or voluntary submaximal effort which [was] not necessarily related to pain, impairment or disability" (R. 176). Physical Therapist DiBacco opined that, "[d]ue to the poor overall validity of this test," he was "forced to estimate [Plaintiff's] functional capacity," which he found to be "work at the light physical demands" (R.

177).

In conjunction with Plaintiff's Functional Capacity Evaluation, Physical Therapist DiBacco also completed a Medical Assessment of the Ability to do Work-Related Activities (Physical) of Plaintiff (R. 202). He filed this report on March 1, 1999 (R. 206). He found Plaintiff could lift and/or carry up to eight pounds up to one-third of an eight-hour day and lift and carry up to six pounds from one-third to two-thirds of an eight-hour workday. Physical Therapist DiBacco found Plaintiff could stand and/or walk for a total of three hours and to stand and/or walk for up to one-half hour without interruption (R. 202). Physical Therapist DiBacco opined Plaintiff could sit for a total of eight hours in an eight-hour work day and could sit for a total of forty-five minutes without interruption. He noted Plaintiff reported she sat for approximately twelve hours in a twenty-four hour day. Physical Therapist DiBacco found Plaintiff could frequently balance, occasionally climb and kneel, and never stoop or crouch (R. 203). Physical Therapist DiBacco found Plaintiff had the following physical limitations: reaching, handling, and pushing/pulling (R. 204). No environmental restrictions were found for Plaintiff (R. 205). Physical Therapist DiBacco noted Plaintiff demonstrated "very poor effort or voluntary submaximal effort, which [was] not necessarily related to pain, impairment, or disability" on the assessment (R. 206)

On February 26, 1999, Plaintiff was evaluated by Teresa George, MA, LPC, at the Elkins Family Counseling Center. Plaintiff was referred by Brian Skinner, her lawyer, for a "mental evaluation," which was to be "used in assisting the court in determining her eligibility for disability benefits." A Clinical Assessment Report was completed of Plaintiff. Plaintiff stated she injured her back in 1993 at her job and was not having "a great deal of success in obtaining medical treatment for the back injury other than pain medications and muscle relaxers." Plaintiff reported she had lost

her ability to "take pleasure in many activities and . . . perform many household tasks due to the pain in her back, and numbness in her extremities." The results of the Bender Gestalt Test revealed no signs of neurological impairment (R. 173). The results of Plaintiff's Projective drawing test were for anxiety, depression, feelings of inferiority, and withdrawal tendencies. On the Kaufman Brief Intelligence Test, Plaintiff scored in a range from average to low average. Her full scale score was eighty-three; her verbal subscale score was seventy-nine; and her performance score was ninety. The Minnesota Multiphasic Personality Inventory-2 test showed Plaintiff "was exaggerating her symptoms somewhat, but not to an extent that would constitute malingering" and she suffered from depressive symptoms, anxious symptoms, and physical difficulties. Plaintiff scored the following on the Wide Range Achievement Test Revision 3: reading was seventy-nine; spelling was seventy-eight; and arithmetic was seventy-six. The grade equivalency scores were for seventh, sixth, and fifth, respectively (R. 174).

Ms. George's diagnoses were for the following: Axis I – Depressive Disorder NOS; Axis II – no diagnosis; Axis III – back injury; Axis IV – inadequate support system, did not graduate from high school and unable to function at high school level, unemployed, insufficient income, and insufficient funds for transportation to health care services; and Axis V – GAF was 55 (R. 174).

On March 18, 1999, Dr. Weinstein wrote Plaintiff continued "to have problems with her low back and [was] more and more disabled." He recommended physical therapy and ordered a cervical MRI. Dr. Weinstein noted his examination of Plaintiff revealed "no obvious nerve root compression findings nor any other myelopathy" (R. 362).

On April 27, 1999, Richard Edmund Topping, M.D., an orthopedic surgeon, conducted a physical examination of Plaintiff, because she sought "another opinion" as to her condition. Plaintiff

12

presented with low back pain radiating to her legs, increased headaches, neck pain, and shoulder pain. Dr. Topping noted Plaintiff's October, 1998, MRI was unavailable for his review; he reviewed the written report from this test (R. 426). Dr. Topping noted Plaintiff smoked one package of cigarettes per day. Dr. Topping observed Plaintiff moved "with some difficulty in and out of the supine and seated position." He noted "slight gibbus at the thoracolumbar junction" of Plaintiff's spine, but "no obvious scoliosis." Plaintiff experienced tenderness in her "lower thoracic level to her lumbosacral junction," but no paravertebral muscle spasm. Dr. Topping observed Plaintiff experienced back pain with supine straight leg raise at fifteen degrees and a negative seated straight leg raise to seventy degrees. Plaintiff had normal sensation through both lower extremities. Her motor strength was "4/5 in the quads on the right and 4+/5 EHL." Plaintiff had left motor strength of "4+ quads and 5- plantar flexors." Dr. Topping noted Plaintiff's "other major lower extremity motor groups [were] 5/5" (R. 427).

The AP and lateral x-rays of Plaintiff taken and reviewed by Dr. Topping at examination revealed a sixteen degree apex left thoracolumbar curvature and a thirty-two degree dyphosis at the thoracolumbar junction. Dr. Topping opined the changes were consistent with an old compression fracture at L1 and "severe degenerative changes at T12, L1 and to a lesser extent L1 and L2." Dr. Topping noted his desire to review Plaintiff's October, 1998, MRI so he could determine if Plaintiff experienced impingement on her neural structures (R. 427). Dr. Topping noted that until a surgical decision could be made, he would suggest Plaintiff seek treatment at a pain clinic, continue her exercise program, and seek care for her headaches with her family doctor (R. 428).

On May, 3, 1999, Plaintiff was examined by Matthew Cupp, M.D. It was noted Plaintiff had a hot and cold intolerance on her back; dizziness; pain in her neck, shoulder, back, and legs;

13

headaches; weakness and limited movement in her legs and back; tremors; and she bruised easily. Plaintiff's musculoskeletal examination revealed tenderness in her lower back and at trigger points. Dr. Cupp assessed back pain, for which he recommended Plaintiff exercise and lose weight, and fibromyalgia, for which he recommended Plaintiff take Ibuprofen and perform stretching exercises (R. 402).

On July 10, 1999, Plaintiff was admitted to Davis Memorial Hospital for chronic gastroenteritis with focal abdominal pain (R. 379). Plaintiff was medicated with Demerol, Phenergan, and Torodal, *via* IV, and it was noted Plaintiff "felt better" (R. 381).

On July 19, 1999, Plaintiff was examined by Dr. Cupp. He diagnosed "biliary colic" and ordered an ultrasound (R. 399).

Plaintiff was again admitted to Davis Memorial Hospital on July 20, 1999, for right side abdominal pain (R. 366). Plaintiff was discharged on July 23, 1999. The discharge report read her liver enzymes were normal, her gallbladder ultrasound was negative, and her "HIDA scan showed an abnormally low ejection fraction at 5% . . . ." Plaintiff requested a second opinion as to her gallbladder. Plaintiff was prescribed Cefotan 1g, Demerol 50mg, and Phenergan 25mg (R. 364).

On November 5, 1999, Plaintiff presented to Dr. Cupp with poor sleep and back and neck pain, which she reported was worse with movement. Dr. Cupp diagnosed fibromyalgia. He prescribed Elavil, Ibuprofen, and Skelaxin (R. 398).

On December 13, 1999, Plaintiff presented to Dr. Cupp with trigger points in her back and poor sleep. Dr. Cupp assessed fibromyalgia and insomnia and continued Plaintiff's medications (R. 396).

On January 9, 2000, Plaintiff reported to the Emergency Department at Davis Memorial

Hospital with low back pain (R. 374). Examination at the hospital revealed decreased range of motion, muscle spasm, tenderness, and vertebral point-tenderness of Plaintiff's back. Her straight leg raising test was negative, bilaterally. Plaintiff had non-tender extremities with full range of motion. She was diagnosed with low back pain (R. 375).

On January 13, 2000, Plaintiff returned to Dr. Cupp with complaints of sleep difficulties in that she slept well at times, she slept unwell at times, and she had difficulty waking. Plaintiff stated her pain was "not completely" helped by Darvocet and was worse in the morning for approximately two hours and at rest. Dr. Cupp's assessment was for back pain (R. 394).

On February 21, 2000, Plaintiff presented to Dr. Cupp with severe frontal and occital headaches. Dr. Cupp assessed fibromyalgia and insomnia (R. 392).

On March 6, 2000, Plaintiff underwent a lumbar spine series at Davis Memorial Hospital's Diagnostic Imaging Center as ordered by Dr. Cupp. Lisa Mullen, M.D., read Plaintiff's x-rays and her impression was for "asymmetric compression of left anterior L1 vertebral body, unchanged from 1-90-00. There is no new evidence for new fracture" (R. 383).

On May 11, 2000, Plaintiff presented to Dr. Cupp with pain in her back, which "start[ed] in shoulders & spread all over body" and lasted approximately one minute. Plaintiff reported she had "blacked out" that she felt tired and "fuzzy" after having done so. Dr. Cupp ordered lipid testing and diagnosed syncopal episode, for which he ordered Plaintiff to wear a monitor (R. 389).

On June 16, 2000, Plaintiff returned to Dr. Cupp and reported she took four Darvocet daily and that her pain was "under good control." Plaintiff reported she had a "bad social situation at home." Dr. Cupp noted Plaintiff had positive trigger points at her upper thoracic spine and lower, right lumbar spine. He diagnosed fibromyalgia and prescribed Darvocet (R. 387).

On August 28, 2000, Dr. Topping wrote to Leilari VanMeter, Plaintiff's Workers' Compensation case manager, that Plaintiff had "developed worsening pain in her back radiating down her leg" that increased with activity. Dr. Topping noted Plaintiff did not deliver her MRI to him for his review. He recommend treatment of Plaintiff at a pain clinic. He suggested she should be evaluated as a possible candidate for epidural cortisone injections (R. 425).

On October 19, 2000, Dr. Topping noted Plaintiff was "still having problems with her back and lower extremities." He noted Plaintiff did not deliver her MRI to him for his review. Dr. Topping informed Plaintiff he would contact her about "definite plans" for treatment after she had provided the MRI to him and he had reviewed it. Dr. Topping encouraged Plaintiff to seek treatment at a pain clinic (R. 424).

On December 11, 2000, Dr. Topping wrote he reviewed Plaintiff's October 4, 1998, MRI and the multiple sagittal and axial images of her lumbar and thoracic spine "demonstrate[d] a compression deformity of L1" and what "appear[ed] to be some impingement of the cauda equina at the superior posterior end plate of L1. Alternatively, this could be small central disc herniation. The neural foramin appear to be patent." Dr. Topping opined he saw no "other obvious areas of stenosis." He did observe a "gibbus at T12/L1 which could be adding to her compressive symptoms" (R. 423).

On December 14, 2000, Plaintiff presented to Dr. Cupp with pain. She reported she could "do most things on Darvocet." Plaintiff stated she had difficulty "bathing dog & shopping but [could] do most other ADL's." Dr. Cupp renewed Plaintiff's prescription for Darvocet (R. 463).

On December 21, 2000, Frank D. Roman, Ed.D., completed a Psychiatric Review Technique of Plaintiff. He found Plaintiff had "no medically determinable mental impairment" (R. 430).

On December 22, 2000, Fulvio Franyutti, M.D., a state agency physician, completed a physical residual functional capacity assessment of Plaintiff. He found Plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and push/pull unlimited (R. 414). He found Plaintiff was limited to "occasional" climbing, balancing, stooping, kneeling, crouching, and crawling (R. 415). He found Plaintiff had no manipulative, visual, and communicative limitations (R. 416-17). Dr. Franyutti found Plaintiff was unlimited in her exposure to extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards, but should avoid concentrated exposure to extreme cold (R. 417). Dr. Franyutti opined Plaintiff's RFC was for light work (R. 418).

On April 4, 2001, Plaintiff reported to Dr. Topping she was "having a lot of problems with her low back pain radiating down both legs" and her legs felt "like they [were] going to give out on her." Dr. Topping noted Plaintiff had an appointment at a pain clinic "later in the month." He opined Plaintiff had "symptoms consistent with DJD and spinal stenosis." He recommended epidural treatment at a pain clinic. In the event the epidural treatment did not produce pain relief, Dr. Topping discussed surgery options with Plaintiff (R. 422, 455).

On May 11, 2001, Plaintiff presented to Dr. Cupp with back pain of "5/10 on Darvocet" and "8/10 off meds." Plaintiff informed Dr. Cupp she could not garden, could lift twenty pounds, could push a shopping cart, and felt tired. Dr. Cupp diagnosed tension, fatigue, and depression. He prescribed Vioxx to Plaintiff (R. 458).

On July 10, 2001, Joseph Kuzniar, Ed.D., reviewed all the evidence in Plaintiff's file and affirmed Mr. Roman's December 21, 2000, assessment that Plaintiff had no medically determinable

mental impairment (R. 430).

On July 13, 2001, Thomas Lauderman, D.O., a state agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff. He found Plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and push/pull unlimited (R. 447). Dr. Lauderman found Plaintiff was limited to occasional climbing, balancing, stooping, kneeling, crouching, and crawling (R. 448). Dr. Lauderman found no manipulative, visual, or communicative limitations for Plaintiff (R. 449-50). Dr. Lauderman found Plaintiff was unlimited in her exposure to extreme heat, wetness, humidity, noise, fumes, odors, dusts, gases, and poor ventilation, but should avoid concentrated exposure to extreme cold, vibrations, and hazards (R. 450).

On August 7, 2001, Bradford Mitchell, M.D., completed an Initial Patient Assessment of Plaintiff. Plaintiff's mammography screening revealed microcalcifications in two locations in her right breast and she was referred to the surgical oncology clinic for evaluation. Plaintiff reported she experienced headaches, occasional blurred vision, loss of sleep, "some weight loss over the last few months and some back pain." Plaintiff informed Dr. Mitchell she had an appendectomy and cholecystectomy in 1999; her medications included Darvocet, Prozac, and Skelaxin; she smoked one package of cigarettes per day; and she did not consume alcohol (R. 456). Dr. Mitchell recommended Plaintiff undergo stereotactic biopsy of the two microcalcifications of her right breast (R. 457).

On January 28, 2002, Plaintiff underwent a mammogram at Davis Memorial Hospital. The impression was for "no significant interval change in appearance in the left side over the past six

month." Additionally, "[t]he appearance of the right breast ha[d] also remained stable with no interval change in the microcalcifications as described previously. These [were] felt to be 'probably benign' with a six month follow-up recommended" (R. 464).

On March 28, 2002, Plaintiff presented to Dr. Cupp for follow-up examination of her back pain. Plaintiff described her pain as dull, burning, and severe. She informed Dr. Cupp that walking helped her condition, but standing made it worse. Dr. Cupp's assessment was for compression fracture L1 vertebra with radiculopathy. He prescribed Percocet and Vioxx (R. 491).

On April 12, 2002, Sharon Joseph, Ph.D., a clinical psychologist, conducted an Adult Mental Profile of Plaintiff. Ms. Joseph filed her report on May 1, 2002 (R. 472). Plaintiff described her activities of daily living as follows: rose at 8:00 a.m.; drank coffee for an hour "until her pain medicine [took] effect; painted if she felt "okay"; washed clothes and cleaned the house, which included making the bed, washing dishes, dusting, cleaning bathroom, in the afternoon; prepared dinner; and rested in the late afternoon because of tiredness and pain. Plaintiff stated she carried out garbage, walked to mailbox, grocery shopped, and drove a car. Plaintiff stated she had difficulty vacuuming and she did not wash windows or mop the floor. Plaintiff listed her social activity as visiting family. She asserted she was "in an abusive relationship where she was not allowed to go anywhere." Ms. Joseph considered Plaintiff's socialization to be mildly impaired (R. 467).

Ms. Joseph's mental examination of Plaintiff revealed she was "alert and oriented x3." Plaintiff was cooperative. She denied appetite disturbances but admitted sleep disturbances. Plaintiff informed Ms. Joseph she had "never been in a pain program" or taken steroids for pain. Plaintiff stated Dr. Topping recommended surgery for her back conditions, from which she had a "50/50" chance of improvement. Plaintiff's mood appeared depressed during the mental status

evaluation. Plaintiff, however, denied any suicidal ideation or homicidal ideation. She presented with no perceptual disturbances, thinking disturbances, hallucinations, delusions, preoccupations, obsessions, or compulsions (R. 468).

Plaintiff had no physical limitations relative to her hearing, dexterity, or speech. She reported "some difficulty with bending and reaching." Her motor activity was calm, posture was appropriate, eye contact was average, language usage was average, speed of speaking was normal, content was relevant, and conduct was cooperative (R. 468).

Plaintiff's scores on the WAIS-III were as follows: Verbal IQ was eighty-eight; Performance IQ was seventy-seven; and Full Scale IQ was eighty-one. Ms. Joseph noted Plaintiff was in the low average range of intellectual functioning. On the WRAT-3, Plaintiff scored in the eighth grade in reading, eighth grade in spelling, and seventh grade in arithmetic (R. 468). Ms. Joseph noted Plaintiff put forth good effort in the test taking and the results were valid. Plaintiff scored an "elevated F" on the MMPI-2 test. Ms. Joseph opined that individuals with a similar clinical profile 1) could be overwhelmed by anxiety, tension, and depression; 2) felt helpless, alone, inadequate, and insecure; 3) attempted to control worries through intellectualization and unproductive self analysis; 4) functioned at a very low level of efficiency; 5) overreacted to minor stress; 6) had a history of poor work and achievement and a chaotic and disorganized lifestyle; 7) lacked basic social skills and had problematic personal relationships; 8) had difficulty establishing lasting, intimate relationships; 9) were introverted; and 10) were often diagnosed with anxiety disorder, dysthymic disorder, and schizoid personality (R. 469). Plaintiff's judgment was within normal limits, concentration was within normal limits, immediate memory was within normal limits, recent memory was moderately impaired, and remote memory was within normal limits (R. 470).

Ms. Joseph made the following diagnostic impression: Axis I – "chronic pain disorder related to both physical and psychological factors" and dysthymic disorder; Axis II – R/O schizoid personality disorder; and Axis III – "history of back injury, back pain, per [Plaintiff's] report." Ms. Joseph found Plaintiff's pace was within normal limits, persistence was adequate, and prognosis was "fair with psychological treatment." Ms. Joseph found Plaintiff was capable of managing her benefits (R. 470).

On April 12, 2002, Ms. Joseph completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) of Plaintiff. She filed that report on May 1, 2002 (R. 472). She found Plaintiff had a slight limitation in understanding and remembering short, simple instructions; slight limitation in carrying out short, simple instructions; and a slight limitation in her ability to make judgments on simple work-related decisions. Ms. Joseph found Plaintiff had a moderate limitation in understanding and remembering detailed instructions and a moderate limitation in carrying out detailed instructions (R. 471). Ms. Joseph found Plaintiff was moderately restricted in her ability to 1) interact appropriately in public, with supervisors, and with co-workers; and 2) respond appropriately to work pressures in the ususal work setting and to changes in a routine setting (R. 472).

On April 29, 2002, Plaintiff reported to Dr. Cupp that she experienced pain, but it was improving. Plaintiff informed Dr. Cupp her pain was at four on a scale of one-to-ten (R. 489). Plaintiff stated she had difficulty resting at night and depressive or anxiety symptoms. Dr. Cupp assessed back pain. He prescribed Percocet to Plaintiff (R. 490).

On May 9, 2002, Plaintiff was examined by Dr. Cupp for poor memory. He reported there were no abnormalities detected (R. 492).

21

On May 30, 2002, Plaintiff presented to Dr. Cupp with a headache. She described it as intermittent, sharp pain (R. 488). Dr. Cupp assessed Plaintiff with headache and ordered a CT scan of Plaintiff's head for June 3, 2002 (R. 488-89).

On August 1, 2002, Plaintiff presented to Dr. Cupp with back pain. She described the pain as continuous (R. 486). He assessed Plaintiff with low back pain and prescribed Percocet (R. 487).

On September 2, 2002, Plaintiff returned to Dr. Cupp for a "recheck" examination (R. 487). He diagnosed low back pain and prescribed Percocet and Skelaxin. Dr. Cupp ordered an MRI of Plaintiff's lumbar spine for July 7, 2002 (R. 487-88).

On September 4, 2002, Plaintiff was examined by Dr. Cupp for back pain (R. 485). She informed Dr. Cupp her pain was unchanged. Dr. Cupp opined Plaintiff had "tenderness in paraspinous muscles in lumbosacral spine region," her "SLR [was] negative," and Plaintiff's "pain [was] greater in extension more so than flexion." Dr. Cupp assessed low back pain and prescribed Percocet (R. 486).

On September 16, 2002, Dr. Weinstein wrote to Dr. Cupp that he had examined Plaintiff, and the examination was negative. He suggested Plaintiff undergo an MRI (R. 474).

On September 16, 2002, Plaintiff was examined by Dr. Cupp. He ordered an MRI (R. 492).

On October 8, 2002, Plaintiff returned to Dr. Cupp for evaluation. She was given a flu shot (R. 485). She stated her pain was five on a scale of one-to-ten. Dr. Cupp assessed back pain and prescribed Percocet and Prozac (R. 485).

On October 14, 2002, Plaintiff underwent an MRI of her lumbar spine. The impression was for "scoliosis with anterior wedging of L1. No disc herniation or spinal stenosis [was] seen" (R. 475).

On October 24, 2002, Dr. Weinstein informed Dr. Cupp that Plaintiff's MRI revealed scoliosis with anterior wedging of L1. He noted Plaintiff had osteoporosis and suggested treatment with Didronel and use of a thoracolumbar brace (R. 473).

On October 24, 2002, Plaintiff was examined by Dr. Cupp for low back pain. He opined Plaintiff had "wedging of L1." He prescribed Didronel and recommended Plaintiff take calcium and vitamin D (R. 492).

On November 14, 2002, Plaintiff returned to Dr. Cupp for a "recheck" examination. Plaintiff stated her pain was continuous, dull, and a six on a scale of one-to-ten (R. 483-84). Plaintiff reported to Dr. Cupp that she had "abnormal MRI results from Dr. Weinstein." Dr. Cupp assessed back pain and prescribed Percocet, Skelaxin, and Vioxx (R. 484).

On December 12, 2002, Plaintiff reported to Dr. Cupp she experienced pain, which was continuous, bilateral with radiation. Plaintiff stated her pain level was five on a scale of one-to-ten. Dr. Cupp's assessment was for compression fracture in L-spine. He prescribed Miacalcin and Percocet. He referred her to Dr. D'Amota (R. 483).

On February 20, 2003, Plaintiff presented to Dr. Cupp (R. 482). She complained of continuous pain without radiation. Plaintiff stated her pain was at six on a scale of one-to-ten. Dr. Cupp diagnosed low back pain and tennis elbow. He instructed Plaintiff to apply ice to her elbow, "alternating with heat 3 times a day" and to "[a]void activities that make it hurt." Dr. Cupp prescribed Percocet and Flonase to Plaintiff (R. 482).

On February 20, 2003, Dr. Cupp conducted a general physical of Plaintiff and reported his findings to the West Virginia Department of Health and Human Resources. He noted Plaintiff's incapacity disorder was "[l]ow back pain prevents prolonged standing, sitting & walking. Cannot

lift very much." Dr. Cupp opined Plaintiff's lungs, chest, and orthopedic examinations were abnormal, but all other systems were normal (R. 478). Dr. Cupp noted Plaintiff described her condition as "severe dull low back pain with any prolonged or extreme activities." Dr. Cupp opined Plaintiff could perform light work, which required maximum lifting of twenty pounds and frequent lifting of ten pounds, and sedentary work, which required maximum lifting of ten pounds or less. Dr. Cupp noted Plaintiff should avoid any work that involved lifting heavy weight and prolonged activities. Dr. Cupp also noted a MRI of Plaintiff's low back "showed compression fracture of L1." He wrote Plaintiff had done strengthening exercises and took drugs to treat her condition. Dr. Cupp opined Plaintiff had "osteoporosis with a compression fracture at L1" and was not "a good candidate for lifting activities" (R. 480). He also found, however, she could not perform any full time work.

On March 13, 2003, Plaintiff reported to Dr. Cupp she had pain that was continuous, but was improving (R. 477, 481). Plaintiff informed Dr. Cupp her pain was a five on a scale of one-to-ten. Dr. Cupp assessed low back pain and prescribed Percocet, Didronel, and Vioxx (R. 481).

On April 24, 2003, Plaintiff presented to Dr. Cupp with continuous, bilateral pain. Plaintiff stated her pain was eight on a scale of one-to-ten. Dr. Cupp assessed low back pain and prescribed Percocet and Flonase (R. 477).

On June 4, 2003, Kip Beard, M.D., completed an Independent Medicine Examination of Plaintiff for the West Virginia Disability Determination Service. Plaintiff informed Dr. Beard she experienced constant lower back pain that radiated to her legs and intermittent neck pain and stiffness that did not radiate. Plaintiff stated her legs ached and throbbed. Plaintiff informed Dr. Beard that standing, bending, stooping, sitting, lifting, and riding increased her pain. Plaintiff asserted she had difficulty "lifting clothes, hanging laundry, vacuuming, and gardening." Plaintiff

informed Dr. Beard her pain was worse in the morning and it took her "a couple of hours to loosen up." Plaintiff stated she "stiffen[ed] up again in the evening" and that cold and rainy weather aggravated her back pain. Plaintiff asserted she experienced a "bitemporal throbbing headache" once per week (R. 499).

Dr. Beard's physical examination of Plaintiff revealed she ambulated with "mildly slow and stiff postured-appearing gait without a limp" (R. 500-01). Plaintiff was able to stand unassisted, had a "mild degree of difficulty arising from a seat and stepping up and down from the examination table," was uncomfortable when seated, and was uncomfortable in supine position (R. 501).

Plaintiff's head, eyes, ears, nose, throat, neck, chest, cardiovascular system, and abdomen were normal upon Dr. Beard's examination. Dr. Beard's examination of Plaintiff's extremities revealed palpable radial, femoral, dorsalis pedis, and posterior tibial pulses. No bruits were observed. There was no peripheral vascular insufficiency, chronic venous stasis changes, clubbing, cyanosis, or edema evident (R. 501).

Dr. Beard's examination of Plaintiff's cervical spine revealed mild pain with range of motion testing; paravertebral tenderness; no spasm; and normal motion for flexion, extension, lateral bending, and rotation. Plaintiff's shoulders, elbows, and wrists were nontender, with no redness, warmth, swelling, or nodules. Plaintiff's forward flexion and adduction of both extended arms were normal; her flexion and extension of both elbows and wrists were normal. Plaintiff's hands were not tender, red, warm, or swollen (R. 501). Plaintiff had full range of motion in all joints of all fingers and was able to make a fist. She presented with no atrophy. Plaintiff's "grip strength measure[d] 70, 70, 70 pounds of force on the right and 60, 60, 60 pounds of force on the left." Plaintiff was able to button and pick up coins with either hand and write with the dominant hand.

25

Plaintiff's knees were without tenderness, redness, warmth, swelling, effusion, laxity, or crepitations, and their extension and flexion were normal. Plaintiff's ankles and feet were normal (R. 502).

Plaintiff's dorsolumbar spine revealed some pain with range of motion testing, and there was paravertebral tenderness and left paravertebral muscular rigidity present. Plaintiff's flexion was seventy-five degrees, extension was ten degrees, and lateral bending was normal. Plaintiff was able to stand on either leg. Dr. Beard observed Plaintiff's seated straight leg-raising test was normal and her supine straight leg test was eighty degrees "on either side with back pain." Plaintiff's hips were without tenderness on palpation and flexion was normal (R. 502).

Plaintiff's neurologic examination revealed "no evidence of weakness on manual muscle testing." Plaintiff's sensation appeared intact. Dr. Beard observed Plaintiff's biceps, triceps, patellar and Achilles deep tendon reflexes were "graded at 2+/4+ bilaterally and symmetrical," which he opined was "normal." The "Hoffmann and Babinski's signs [were] negative and there [was] no clonus." Dr. Beard noted Plaintiff could "heel walk, toe walk, heel-to-toe walk," but experienced difficulty arising from a squat because of back pain (R. 502).

Dr. Beard's impression was for the following: 1) "[h]istory of remote back injury in motor vehicle accident with L1 compression fracture and possible T5 and T12 compression fractures," chronic back pain, and chronic dorsolumbar myofascial pain superimposed upon compression fracture and degenerative disc disease; and 2) "[c]hronic neck pain" and chronic cervical myofascial pain (R. 502). Dr. Beard summarized his findings as follows: Plaintiff presented "without ambulatory aids and [her] gait [was] a bit slow and stiff postured. She has some difficulty with functional testing associated with back pain. Examination of the back reveal[ed] some palpable muscular rigidity with paravertebral and spinous process tenderness, some pain with motion testing

26

and loss of motion in the lumbar spine without findings of radiculopathy. Neck exam reveal[ed] some pain with motion testing and tenderness with well-preserved motion. No findings of radiculopathy or myelopathy were present" (R. 503).

On June 9, 2003, Dr. Cupp noted Plaintiff's "active problems" as low back pain, hepatitis C, depression, and compression fracture at L1. He noted her medication included Percocet, Skelaxin, and Didronel (R. 476).

On July 9, 2003, Thomas Stein, Ed.D., completed a Mental Status Examination of Plaintiff for the West Virginia Disability Determination Service. Mr. Stein noted Plaintiff "traveled alone three quarters of an hour driving her own vehicle" to participate in the evaluation and observed Plaintiff was cooperative, polite, subdued; had adequate posture and gait; demonstrated no involuntary movements; and used no aids in ambulation (R. 509). Plaintiff informed Mr. Stein her "back pain is so severe that I can only do things for a short time. I have aching in my legs. My concentration is bad and I have trouble completing what I start. I have to take frequent rest breaks because of the pain. I cannot eat for nausea and upset stomach and my nerves are real bad right now. I just have difficulty in getting through the day and can hardly get done what I need to be doing. I'm always losing things that I lay down. I have intense headaches that wake me up at night and they can last for days. I have trouble sleeping and wake up every couple of hours" (R. 509-10).

Plaintiff stated her sleep disturbance was "frequent awakening" and her eating disturbance was nausea. Plaintiff reported to Mr. Stein that she experienced two crying episodes per day and two panic attacks per week. She described her energy level as "'zero'" and mood as "'pretty sad.'" Plaintiff admitted to having had attempted suicide twice during her teenage years but stated she had no "current plan for suicide." Mr. Stein opined he considered Plaintiff "pose[d] a mild risk [for

suicide] presently." Plaintiff asserted she did not experience phobias, obsessions, or compulsions (R. 510).

Mr. Stein noted Plaintiff had been treated for depression 1) "beginning at age 15" and had attempted suicide; 2) by her primary care physician at age twenty-five for a six-month period; 3) with inpatient hospitalization at age twenty-five; and 4) by her primary care physician "at age 41 to present" with psychoactive drugs (R. 511).

Mr. Stein opined Plaintiff was cooperative, polite, subdued; maintained good eye contact; was introverted; and had good conversational skills during the evaluation. According to Mr. Stein, Plaintiff's speech was relevant, coherent, and normally paced. She was oriented well to time, place, person, and date. Her mood was depressed and her affect was subdued. Plaintiff's thought process was without disturbances, and her thought content was void of delusions, preoccupations, obsessions, or phobias. Plaintiff denied hallucinations. Her insight was adequate and judgment was average. Plaintiff admitted to suicidal ideations in the past, but not at the time of the evaluation. Her immediate memory was mildly deficient, recent memory was moderately deficient, and remote memory was moderately deficient (R. 512).

Plaintiff's subjective symptoms were chronic back pain, chronic nausea, poor appetite, poor memory and concentration, depressed mood, panic attacks, sleep disturbances, and frequent headaches. Mr. Stein listed Plaintiff's objective symptoms as cooperative, polite, subdued, below average intelligence, poor concentration, poor memory, mildly depressed mood, and mildly anxious. He diagnosed the following: 1) Axis I – pain disorder associated with general medical condition and psychological factors and dysthymia; 2) Axis II – no diagnosis; 3) Axis III – chronic back pain, frequent headaches and fibromyalgia – as per patient report (R. 513).

Plaintiff noted the following activities of daily living: rose at 8:00 a.m.; cared for her personal hygiene; prepared and drank coffee; took shower and dressed; let her dogs out of the house; cleaned kitchen; did laundry; vacuumed; dusted; prepared boyfriend's lunch; completed more household chores with rest breaks; napped for one-half hour in the afternoon; went to the store if necessary; prepared dinner; ate dinner with her boyfriend at 6:30; lay down after dinner; watched television; and retired at 9:30 p.m. Plaintiff asserted she did not do yard work, gardening, automobile mechanic work, cut or carry firewood, hunt, fish, or collect anything. Plaintiff sat on the porch, visited the post office, read, ran errands, drove, and walked short distances. She painted as a hobby. Plaintiff stated she did not attend church or hold memberships in clubs. (R. 513). Plaintiff occasionally visited friends and relatives, but not neighbors. Mr. Stein opined Plaintiff was "mildly deficient in the social functioning area." Mr. Stein found Plaintiff's concentration was moderately deficient, persistence was mildly deficient, and pace was moderately slow. Mr. Stein opined Plaintiff could manage her own finances (R. 514).

Mr. Stein completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) of Plaintiff on July 9, 2003. He found Plaintiff had no limitation in her ability to understand, remember, and/or carry out short, simple instructions. Mr. Stein opined Plaintiff had a slight limitation to her ability to understand and remember detailed instructions and make judgments on simple work-related decision. Mr. Stein found Plaintiff was moderately limited in her ability to carry out detailed instructions (R. 515). Mr. Stein opined Plaintiff was slightly limited in her ability to interact appropriately with the public, supervisors, and/or co-workers and to respond appropriately to changes in a routine work setting. Mr. Stein found Plaintiff was moderately limited in her ability to respond appropriately to work pressures in a usual work setting (R. 516).

On October 3, 2003, L. Leon Reid, Ph.D., completed a medical report of Plaintiff. Dr. Reid listed Plaintiff's conditions, impairments, and limitations as found by Drs. Weinstein, Paroda, Franyutti, Brown, Topping, Cupp, Lauderman, Beard, the doctors at Davis Memorial Hospital, Psychologist Stein, and Physical Therapist DiBacco (R. 517-18). Dr. Reid listed evaluations for Plaintiff relative to substance abuse and psychological symptomatology, which were performed by Ms. Joseph, Mr. Stein, Ms. George, and Dr. Cupp (R. 519-21). Dr. Reid's summary and recommendation were as follows: Plaintiff "has a back condition of long standing, which includes a pain factor, all of which has contributed to a Moderate Depression, generally the DX of Dysthymia. This record does not suggest the meeting or equaling of any listing under 12.00 Mental Disorders. The best job placement would be in a temperature controlled environment, devoid of excessive noises and vibrations, away from moving machinery and heights, with the absence of extreme dusts, smells, fumes, and the like. The work should be simple, routine working with 1-2 other co-workers, with a sit/stand at will option, with no overhead reaching and no frequent extension/reaching with the upper extremities" (R. 521).

On October 29, 2003, an administrative hearing was conducted by ALJ McDougall. Plaintiff testified the main problem affecting her ability to work was she did not "have enough energy to keep going" and she would "just give out." Plaintiff stated her pain got so bad that her "body just don't want to go . . . after a few hours of doing anything . . . I'm just wore out (R. 550-51). Plaintiff testified she was being treated for lower back pain, depression, headaches, and fibromyalgia. Plaintiff stated the bones in her back "were worn out" and "now collapsed," so her physicians were administering "medicine trying to build that bone back." Plaintiff testified she experienced pain from the middle of her back down into her buttocks, which caused her legs to "ache and throb."

Plaintiff stated she could stand without moving for approximately twenty minutes and stand with movement for about one hour (R. 551). Plaintiff testified she had to sit for approximately one-half hour after having moved around. Plaintiff said she could sit "for awhile" if she were able to "get up and move around." Plaintiff estimated she could sit for "at least an hour or so" and "[m]aybe two hours." Plaintiff testified she walked for fifteen to twenty minutes, twice a day. Plaintiff stated her fingers and hands "cramp up now and then, but not really bad" (R. 552). Plaintiff asserted she could lift ten to fifteen pounds, "without pain." Plaintiff testified rain, snow, cold, bending, and climbing or descending stairs exacerbated her pain. Plaintiff stated her back pain was alleviated by taking pain medication, using a heating pad, taking hot showers, and lying down (R. 553). Plaintiff asserted fibromyalgia manifested itself as "achiness of my muscles," which she described as a feeling "like they're ripping sometimes." Plaintiff stated her fibromyalgia symptoms were constantly present (R. 554). Plaintiff testified she experienced a headache once, and "sometimes twice," per week, which lasted twenty-four to forty-eight hours (R. 554-55). Plaintiff stated her depression manifested itself in her feeling "like everything's so hopeless" and the person she lived with made her depression worse (R. 556). Plaintiff testified she tried to stay at a location away from the individual with whom she lived "until he calms down or whatever" (R. 557).

Plaintiff testified her activities of daily living were as follows: She rose at 8:00 a.m., drank coffee, took her puppies to their dog pen outside, washed dishes, cleaned kitchen, did housework, and prepared lunch and then dinner for her boyfriend (R. 558). Plaintiff stated she shopped for groceries once every two weeks (R. 588). Plaintiff asserted she did not visit friends or relatives, she infrequently received visitors, did not attend church, did not go to the movies or a restaurant, did not watch television, and did not "read very long" because it hurt her eyes (R. 560).

Dr. Reid testified at the administrative hearing that Plaintiff's IQ was eighty-one, reading and spelling level was eighth grade, arithmetic level was seventh grade, and a GAF of 55. Dr. Reid opined Plaintiff's mental diagnosis was "primarily in the dysthymia or moderate depression area. And she has severe pain. She has had pain ratings from 5 over 10, to 8 over 10, and 4 over 10 . . . So basically she does not meet any listings under 1200, mental disorders. And basically she is moderately depressed . . . " (R. 564). Dr. Reid testified Plaintiff's activities of daily living "are only moderately limited, but not by mental disorder. Mainly through her pain. The social factor is average (mild) for her cultural level. . . . The concentration, persistence, and pace would be moderately limited due to pain. And there's no decompensation . . . ." Dr. Reid opined Plaintiff did not meet any of the "C" criteria. Dr. Reid testified Plaintiff would be limited by her mental function as follows: ". . . she would best work in simple, routine-type work tasks, working with one or two other coworkers. She should have a sit-stand option at will. There should be no overhead reaching or no frequent extension of her upper extremities. This is primarily because of her pain. The pain factor should be considered in her job placement. That she should not be in any activities that would aggravate that, because this would interfere with her concentration, persistence, and pace. . . . [N]o excessive noise or vibrations. She should be away from moving machinery, and avoid being near heights. And she should also not have any excessive dust, odors, fumes, and the like. Best be in a temperature controlled environment" (R. 565).

At the administrative hearing, the ALJ asked the VE the following hypothetical question: "If we assume a person with the same age, education, and work experience as the Claimant. And assume the person is able to do light work as that's defined in the Commissioner's regulations. But assume there'd be no more than occasional climbing, balancing, stooping, kneeling, crouching, or

crawling. Assume the person should have a – basically a sit-stand option, and no more than occasional bending at the waist. And the job should be simple, routine work. No more than one to two coworkers. No more than occasional overhead work, or extension of the arms more than about 18 inches from the body. No more than average levels of noise or vibration. No moving – no work at heights, or around hazards, or dangerous moving machine. No excessive fumes, dust, gasses, or other respiratory irritants. And no exposure to extreme heat or cold, or wetness or humidity. If a person with those limitations – would they be able to do the past relevant work or the jobs of transferable skills?" (R. 567-68). The VE responded in the negative. The ALJ then asked the VE: "Would there be any other work such a person could do?" The VE responded: "Okay, the following would fit within the hypothetical . . . . Work as a photographic machine operator. Have 80,000 for the national. For the region have 400. . . . Inserting machine operator. You have 80,000 again for the national, and for the region you're actually looking at 300. Microfilm mounter, 65,000 for the national, 200 for the region. Photostat operator helper, 77,000 national, 300 regional. That's a sampling, sir. It is consistent with the DOT" (R. 568-69).

The ALJ then asked the VE if there would "be any sedentary level jobs . . . ." The VE responded as follows: "Surveillance system monitor, 200,000 for the national, and you have over 1,000 for the region. Plastic design applier, 60,000 national, 300 regional. Laminator I, 75,000 for the national, 400 for the region. Mounter, 95,000 national, regional over 300" (R. 569). The VE also testified that a person could miss up to two days a month and still have these jobs available to her (R. 569-70).

### III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's

33

regulations at 20 C.F.R. § 416.920 (1997), ALJ McDougall made the following findings:

1. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

2. The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR § 416.920(b).

3. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

5. The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR § 416.927).

6. The claimant has the following residual functional capacity: The claimant retains the ability to perform a range of light work with no more than occasional climbing, balancing, stooping, kneeling, crouching, crawling, or bending at the waist. The claimant must be permitted to sit or stand at will. The claimant is limited to simple routine work with only 1-2 co-workers. The claimant is limited to no more than occasional overhead work or reaching more than 18 inches from her body. The claimant [sic] must avoid concentrated exposure to temperature extremes, noise, vibration, unprotected heights, dangerous moving machinery, excessive fumes, dust, gases, or other pulmonary irritants, dampness, and humidity. The claimant must be permitted to miss up to 2 days of work per month.

7. The claimant is unable to perform any of her past relevant work (20 CFR § 416.965).

8. The claimant is a "younger individual between the ages of 45 and 49" (20 CFR § 416.963).

9. The claimant has "a limited education" (20 CFR § 416.964).

10. The claimant has no transferable skills from any past relevant work (20 CFR § 416.968).

11. The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 416.967).

12. Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.18 as a framework for

34

decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include work as photographic machine operator, 400/80,000; inserting machine operator, 300/80,000; microfilm mounter, 200/65,000; photostat operator helper, 300/77,000.

13. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 416.920(f) (R. 33-34).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990), (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Secretary's decision, the reviewing court must also consider whether the administrative law judge applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions of the Parties

In her letter, which the District Judge ordered filed as a Motion for Summary Judgment, Plaintiff contends she is disabled due to severe pain in her legs and back, side effects from medication, and memory and concentration problems.

The Commissioner contends substantial evidence supports the commissioner's decision that Plaintiff could perform a limited range of light work and, therefore, was not disabled. Plaintiff did not respond to the Commissioner's contentions, despite being informed by the Court of her right to do so.

### C. Physical Impairments

Plaintiff argues she is disabled by severe pain in her legs and back, side effects from medication, and mental impairments. The undersigned will consider the alleged physical impairments first.

At the first step in the sequential evaluation, the ALJ determined Plaintiff had not engaged in substantial gainful activity since her alleged onset of disability. At the second step, the ALJ found Plaintiff had medically determinable back impairments, headaches, osteoporosis, and fibromyalgia. The ALJ next found these impairments were severe but did not meet or equal a Listing. There is no dispute regarding these steps of the sequential evaluation. The undersigned finds substantial evidence supports the ALJ's findings at Steps One, Two, and Three of the sequential evaluation.

The ALJ next determined the evidence of record established a basis for a degree of pain and functional limitation associated with Plaintiff's impairments, but failed to support the disabling degree she alleged.

The ALJ first noted that none of Plaintiff's examining or treating physicians opined that Plaintiff was totally disabled from all work. This finding is supported by the evidence of record. The ALJ next discussed Plaintiff's Functional Capacity Evaluation, noting she had passed only 22 of 41 validity criteria, which the evaluator opined suggested very poor, voluntary submaximal effort unrelated to pain, medical impairment or disability.

36

The ALJ also discussed the medical evidence, including Dr. Weinstein's opinion that he could find no obvious nerve compression effects; Dr. Weinstein's prescription for isometric exercise, a walking program, and physical therapy; Dr. Cupp's opinion that Plaintiff was capable of performing work at the light or sedentary level, but was not a good candidate for lifting activities; and Dr. Beard's opinion that Plaintiff could perform light work.

The ALJ also considered the opinions of the State agency reviewing physicians. On June 2, 1998, a State agency physician found Plaintiff could occasionally lift and/or carry up to twenty pounds; frequently lift and/or carry up to ten pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and push/pull unlimited (R. 144). She should limit climbing, balancing, stooping, kneeling, crouching, and crawling to "frequently" (R. 145). She had no manipulative, visual, or communicative limitations (R. 146-47). She should avoid concentrated exposure to extreme cold, but had no other environmental limitations. (R. 147). He concluded that Plaintiff was "able to perform light range [of] work" (R. 148).

On August 17, 1998, a second State agency physician found Plaintiff could occasionally lift and/or carry up to twenty pounds; frequently lift and/or carry up to ten pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight hour workday; and push/pull unlimited (R. 152). She should limit climbing, balancing, stooping, kneeling, crouching, and crawling to "frequently" (R. 153). She had no manipulative, visual, communicative, or environmental limitations (R. 154-55). Her RFC was "reduced to light" (R. 156).

On December 22, 2000, a third State agency physician found Plaintiff could occasionally lift

and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and push/pull unlimited (R. 414). He found Plaintiff limited to climbing, balancing, stooping, kneeling, crouching, and crawling "occasionally" (R. 415). She had no manipulative, visual, and communicative limitations (R. 416-17). She should avoid concentrated exposure to extreme cold, but had no other environmental limitations (R. 417). Her RFC was for light work (R. 418).

On July 13, 2001, a fourth State agency physician found Plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and push/pull unlimited (R. 447). She was limited to "occasional" climbing, balancing, stooping, kneeling, crouching, and crawling (R. 448). She had no manipulative, visual, or communicative limitations for Plaintiff (R. 449-50). She should avoid concentrated exposure to extreme cold, vibrations, and hazards but had no other environmental limitations (R. 450).

The ALJ found the State agency reviewing physicians' opinions were well-supported by the medical and other evidence in the record, and therefore adopted their assessment "as modified by restrictions found or imposed by other consultative or treating sources." In addition, the ALJ retained Dr. Reid as an Independent Medical Expert. Dr. Reid opined that Plaintiff should have a sit-stand option at will. There should be no overhead reaching or no frequent extension of her upper extremities. She should not be in any activities that would aggravate her pain, because that would interfere with her concentration, persistence, and pace. She should avoid excessive noise or vibrations. She should be away from moving machinery, and avoid being near heights. And she should also not have any excessive dust, odors, fumes, and the like. She should work in a

temperature controlled environment (R. 565).

20 C.F.R. § 416.927(f)(2)(i) provides, in pertinent part:

Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists. However, State agency medical or psychological consultants, or other program physicians or psychologists are highly qualified physicians and psychologists who are also experts in Social Security disability evaluations. Therefore, administrative law judges must consider findings of State agency medical or psychological consultants, or other program physicians or psychologists. as opinion evidence, except for the ultimate determination about whether you are disabled.

The ALJ was therefore not only entitled, but was required to consider the opinions of the State agency medical consultants. All four of the State agency reviewing physicians, as well as Dr. Reid, opined that Plaintiff could perform work at the light exertional level. They all also found she could stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and push/pull unlimited. The more restrictive opinions limited her to occasional climbing, balancing, stooping, kneeling, crouching, and crawling (R. 448). She had no manipulative, visual, or communicative limitations. The most restrictive RFC stated she should avoid concentrated exposure to extreme cold, vibrations, and hazards but had no other environmental limitations. In addition Dr. Reid opined that Plaintiff should have a sit-stand option at will; there should be no overhead reaching or no frequent extension of her upper extremities; no excessive noise or vibrations; she should be away from moving machinery, and avoid being near heights; she should also not have any excessive dust, odors, fumes, and the like; and she should work in a temperature controlled environment (R. 565).

Based on all this evidence, the ALJ determined that Plaintiff could perform work at the light exertional level with no more than occasional climbing, balancing, stooping, kneeling, crouching,

crawling, or bending. She must be permitted to sit or stand at will. She was limited to no more than occasional overhead work or reaching more than 18 inches from her body. She must avoid concentrated exposure to temperature extremes, noise, vibration, unprotected heights, dangerous moving machinery, excessive fumes, dust, gases, or other pulmonary irritants, dampness, and humidity. In addition, she must be permitted to miss up to two days of work per months.

The undersigned finds the ALJ's Physical RFC is substantially supported by all the State agency physicians' opinions, as well as that of the Independent Medical Expert. It is also supported by the Physical Therapist's estimate that Plaintiff could perform work at the light physical demands level.

The Physical RFC is also substantially supported by Plaintiff's treating physician's findings as reported to the West Virginia Department of Health and Human Resources. Dr. Cupp noted Plaintiff's incapacitating disorder was "[l]ow back pain prevents prolonged standing, sitting & walking. Cannot lift very much." He then noted Plaintiff described her condition as "severe dull low back pain with any prolonged or extreme activities." He opined Plaintiff could perform light work, which required maximum lifting of twenty pounds and frequent lifting of ten pounds, and sedentary work, which required maximum lifting of ten pounds or less. He noted Plaintiff should avoid any work that involved lifting heavy weight and prolonged activities. He finally opined that Plaintiff was not "a good candidate for lifting activities." The undersigned notes that in addition to the above limitations, Dr. Cupp also opined that Plaintiff was not able to perform any full time work at all. He expressly based this opinion on Plaintiff's description of her pain as "severe dull low back pain with any prolonged or extreme activities." The ALJ was entitled to reject this opinion as regarding "an issue reserved to the Commissioner." Additionally, however, the ALJ took into

account the restriction on prolonged or extreme activities.

In addition, the undersigned finds the ALJ's RFC is consistent with Plaintiff's own statements regarding her daily acitivities.

For all the above reasons, the undersigned finds substantial evidence supports the ALJ's determination regarding Plaintiff's physical impairments and his physical RFC.

### D. Mental Impairments

The ALJ also found Plaintiff had medically determinable mental impairments -- a pain disorder and dysthymic disorder. The undersigned finds substantial evidence supports this finding. The ALJ again found these impairments were severe, but did not meet or equal a Listing. Plaintiff underwent two psychological examinations, one by Dr. Joseph and one by Dr. Stein. In addition, the ALJ retained an Impartial Expert, Dr. Reid, to assist in determining Plaintiff's limitations. Upon review of all the evidence, the ALJ determined that Plaintiff would have a moderate limitation on her activities of daily living. This is substantially supported by Dr. Reid's opinion and Plaintiff's own statements regarding her daily activities. The ALJ also found Plaintiff would have a mild limitation in social functioning. This is substantially supported by Plaintiff's own statements, as well as both examining psychologists' and the Impartial Expert's opinions. The ALJ then found Plaintiff had moderate limitations on her concentration, persistence and pace. This again is supported by the three psychologists' opinions. Dr. Joseph opined Plaintiff displayed adequate persistence and her concentration and pace were within normal limits. Dr. Stein found Plaintiff's concentration and pace moderately deficient and her persistence mildly deficient, and Dr. Reid found Plaintiff would have moderate limitations of her concentration, persistence and pace. The ALJ gave Plaintiff the benefit of the doubt by using the opinion that was most in Plaintiff's favor, in this case, Dr. Reid's. Finally,

the ALJ found Plaintiff had suffered no episodes of decompensation in a work or work-like setting.

Plaintiff therefore did not meet the "B" criteria of any mental listing. The ALJ also found Plaintiff did not meet the "C" criteria of any mental listing, because the evidence did not establish a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause her to decompensate, or a history of one or more years of inability to function outside a highly supportive living arrangement.

The undersigned finds substantial evidence supports the ALJ's determination that Plaintiff's mental impairments did not meet or equal a listing.

On February 26, 1999, Plaintiff was evaluated by Teresa George, MA, LPC, at the request of her then-counsel. The results of the Bender Gestalt Test revealed no signs of neurological impairment (R. 173). The results of Plaintiff's Projective drawing test were for anxiety, depression, feelings of inferiority, and withdrawal tendencies. On the Kaufman Brief Intelligence Test, Plaintiff scored in a range from average to low average. The Minnesota Multiphasic Personality Inventory-2 test showed Plaintiff "was exaggerating her symptoms somewhat, but not to an extent that would constitute malingering" and she suffered from depressive symptoms, anxious symptoms, and physical difficulties. Plaintiff scored the following on the Wide Range Achievement Test Revision 3: reading was seventy-nine; spelling was seventy-eight; and arithmetic was seventy-six. The grade equivalency scores were for seventh, sixth, and fifth, respectively (R. 174).

Ms. George's diagnoses were for the following: Axis I – Depressive Disorder NOS; Axis II – no diagnosis; Axis III – back injury; Axis IV – inadequate support system, did not graduate from high school and unable to function at high school level, unemployed, insufficient income, and

insufficient funds for transportation to health care services; and Axis V – GAF was 55[1] (R. 174).

On December 21, 2000, Frank D. Roman, Ed.D., completed a Psychiatric Review Technique of Plaintiff. He found Plaintiff had "no medically determinable mental impairment" (R. 430).

On July 10, 2001, Joseph Kuzniar, Ed.D., reviewed all the evidence in Plaintiff's file and affirmed Mr. Roman's December 21, 2000, assessment that Plaintiff had no medically determinable mental impairment (R. 430).

On April 12, 2002, Sharon Joseph, Ph.D., a clinical psychologist, conducted an Adult Mental Profile of Plaintiff. Plaintiff's mood appeared depressed, but she denied any suicidal ideation or homicidal ideation. She presented with no perceptual disturbances, thinking disturbances, hallucinations, delusions, preoccupations, obsessions, or compulsions (R. 468). Her motor activity was calm, posture was appropriate, eye contact was average, language usage was average, speed of speaking was normal, content was relevant, and conduct was cooperative (R. 468).

Plaintiff's scores on the WAIS-III were within the low average range of intellectual functioning. On the WRAT-3, Plaintiff scored in the eighth grade in reading, eighth grade in spelling, and seventh grade in arithmetic (R. 468). Ms. Joseph noted Plaintiff put forth good effort in the test taking and the results were valid (R. 469). She noted, however, that Plaintiff's responses to latter questions on the MMPI-2 were "somewhat exaggerated in comparison to her responses to earlier items," but opined this may have been due to carelessness. Nevertheless, this should be taken into consideration.

---

[1] A GAF of 51-60 indicates **Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflict with peers or coworkers). Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

Ms. Joseph opined that Plaintiff's judgment was within normal limits, her concentration was within normal limits, her immediate memory was within normal limits, her recent memory was moderately impaired, and her remote memory was within normal limits (R. 470). She diagnosed Chronic Pain Disorder related to both physical and psychological factors; Dysthymic Disorder, and Rule Out Schizoid Personality Disorder.

Ms. Joseph found Plaintiff's pace was within normal limits, persistence was adequate, and prognosis was "fair with psychological treatment." Ms. Joseph found Plaintiff was capable of managing her benefits (R. 470).

Ms. Joseph completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) of Plaintiff, opining she had a slight limitation in understanding and remembering short, simple instructions; slight limitation in carrying out short, simple instructions; and a slight limitation in her ability to make judgments on simple work-related decisions. Ms. Joseph found Plaintiff had a moderate limitation in understanding and remembering detailed instructions and a moderate limitation in carrying out detailed instructions (R. 471). Ms. Joseph found Plaintiff was moderately restricted in her ability to 1) interact appropriately in public, with supervisors, and with co-workers; and 2) respond appropriately to work pressures in the ususal work setting and to changes in a routine setting (R. 472).

On May 9, 2002, Plaintiff was examined by Dr. Cupp for poor memory. He reported there were no abnormalities detected (R. 492).

On July 9, 2003, Thomas Stein, Ed.D., completed a Mental Status Examination of Plaintiff for the West Virginia Disability Determination Service. Dr. Stein noted Plaintiff "traveled alone three quarters of an hour driving her own vehicle" to participate in the evaluation. He noted she was

cooperative, polite, subdued, maintained good eye contact, was introverted, and had good conversational skills during the evaluation. Her speech was relevant, coherent, and normally paced. She was oriented well to time, place, person, and date. Her mood was depressed and her affect was subdued. Her thought process was without disturbances, and her thought content was void of delusions, preoccupations, obsessions, or phobias. Plaintiff denied hallucinations. Her insight was adequate and judgment was average. Plaintiff admitted to suicidal ideations in the past, but not at the time of the evaluation. Her immediate memory was mildly deficient, recent memory was moderately deficient, and remote memory was moderately deficient (R. 512).

Dr. Stein listed Plaintiff's objective symptoms as cooperative, polite, subdued, below average intelligence, poor concentration, poor memory, mildly depressed mood, and mildly anxious. He diagnosed the following "Pain Disorder associated with general medical condition and psychological factors and Dysthymia (R. 513).

Dr. Stein opined Plaintiff was "mildly deficient in the social functioning area." He found Plaintiff's concentration was moderately deficient, persistence was mildly deficient, and pace was moderately slow. Dr. Stein opined Plaintiff could manage her own finances (R. 514).

Dr. Stein completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) of Plaintiff on July 9, 2003. He found Plaintiff had no limitation in her ability to understand, remember, and/or carry out short, simple instructions; a slight limitation in her ability to understand and remember detailed instructions and make judgments on simple work-related decision; a moderate limitation in her ability to carry out detailed instructions; a slight limitation in her ability to interact appropriately with the public, supervisors, and/or co-workers and to respond appropriately to changes in a routine work setting; and a moderate limitation in her ability to respond

appropriately to work pressures in a usual work setting (R. 516).

Finally, on October 3, 2003, L. Leon Reid, Ph.D., completed a medical report of Plaintiff. Dr. Reid listed Plaintiff's conditions, impairments, and limitations as found by Drs. Weinstein, Paroda, Franyutti, Brown, Topping, Cupp, Lauderman, Beard, the doctors at Davis Memorial Hospital, Psychologist Stein, and Physical Therapist DiBacco (R. 517-18). Dr. Reid listed mental evaluations performed by Ms. Joseph, Mr. Stein, Ms. George, and Dr. Cupp (R. 519-21). Dr. Reid's summary and recommendation were as follows: Plaintiff "has a back condition of long standing, which includes a pain factor, all of which has contributed to a Moderate Depression, generally the DX of Dysthymia. This record does not suggest the meeting or equaling of any listing under 12.00 Mental Disorders. The best job placement would be in a temperature controlled environment, devoid of excessive noises and vibrations, away from moving machinery and heights, with the absence of extreme dusts, smells, fumes, and the like. The work should be simple, routine working with 1-2 other co-workers, with a sit/stand at will option, with no overhead reaching and no frequent extension/reaching with the upper extremities" (R. 521).

The ALJ accorded more weight to the mental RFC determined by Dr. Stein than that of Dr. George. He accorded the greatest weight to the opinion of Dr. Reid, the Independent Psychological Expert, who had reviewed the record, including the examining psychologists' reports.

Insofar as there is any conflict between the psychological evaluations, in Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990), the Fourth Circuit stated that the ALJ bears the ultimate responsibility for weighing the evidence and resolving any conflicts, and that, in reviewing for substantial evidence, the reviewing court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. The ALJ was therefore

entitled to give greater weight to Dr. Stein's and Dr. Reid's evaluations and recommendations. The ALJ determined Plaintiff could perform simple, routine work with only one to two co-workers. This finding is supported by the evaluations of Dr. Stein and Dr. Reid.

The ALJ's mental RFC is also consistent with Plaintiff's past mental health treatment and her own statements regarding her daily activities.

Accordingly, the undersigned finds substantial evidence supports the ALJ's determination regarding Plaintiff's mental impairments and her limitations as a result of her mental impairments.

## V. RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's application for Supplemental Security Income is supported by substantial evidence, and I accordingly recommend that the Defendant's Motion for Summary Judgment [Docket Entry 9] be **GRANTED,** Plaintiff's Motion for Summary Judgment [Docket Entry 8] be **DENIED,** and this matter be dismissed from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Recommendation for Disposition, file with the Clerk of the Court written objections identifying the portions of the Proposed Findings of Fact and Recommendation for Disposition to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to the Proposed Findings of Fact and Recommendation for Disposition set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such proposed findings and recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce,* 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins,* 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn,*

474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record

Respectfully submitted this 2 day of February, 2006.


_____
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE